

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
                )
       Plaintiff-Respondent, )
v. )      No. SD33505
                )      Filed: 1-26-16
TERRY GLENN FRITZ, )
                )
       Defendant-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF TEXAS COUNTY

Honorable David G. Warren, Senior Judge

### AFFIRMED

Following a jury trial, Terry Fritz (Defendant) was convicted of first-degree murder and armed criminal action (ACA) for shooting and killing Kinga Gillibrand (Victim), who was pregnant at the time of her death. *See* §§ 565.020, 571.015.[1] Defendant presents three points for decision. He contends the trial court: (1) plainly erred in accepting his waiver of counsel and permitting him to proceed *pro se*; (2) abused its discretion in overruling his motion for mistrial after a law enforcement witness displayed a weapon unrelated to the crime charged; and (3)

---

[1] All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2015).

abused its discretion in admitting evidence regarding the discovery of fetal bones found with Victim's remains. Finding no merit in any of these points, we affirm.

An appellate court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict and disregards all contrary evidence and inferences. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). Viewed from that perspective, the favorable evidence and inferences supporting the State's case against Defendant are summarized below.

Victim and Defendant were involved in an intimate relationship. They met in 2005 and were together until Victim was murdered. They had lived in Bloomington, Illinois, but moved to Defendant's mother's home in Meta, Missouri. Their son (Son) was born in July 2006, and Victim was 16 weeks pregnant with a second child at the time of her death. Victim had her last prenatal visit with her obstetrician on June 7, 2010.

Defendant also was involved in an intimate relationship with Danielle Beaumont Smith (Smith). They met in 2007 while she was working at Home Depot in Normal, Illinois. He frequently came into the store with Son. He said that he was divorced from Victim and was a single father. Smith became pregnant by Defendant, and their daughter was born in August 2009. Smith didn't see Defendant often and was concerned about his honesty. Defendant told Smith that Victim had moved in with him in 2008 because she didn't have a job and needed a temporary place to stay. Victim called Smith, however, and told her that Defendant and Victim were still in a relationship. Smith confronted Defendant, and he said that Victim liked to cause drama and that they were not together. Defendant said that Victim was unstable and that she didn't want to be a mother, which was why he had full custody of Son. According to Defendant, Victim had a drug problem and anger issues.

2

Defendant told Smith that he was living in his own home and described it as a "bachelor pad" that he had built for himself. He said that he wanted Smith, their daughter, and her mother to move in with him. Smith didn't know that Victim and Son were living there. Defendant told Smith that Victim had moved to Colorado with her boyfriend.

On June 8, 2010, Defendant and Son went to the Walmart in Rolla. At about 9:25 a.m., Defendant purchased two pillows, a mattress cover, a DVD, and a toy. Wilford Gann (Gann) and Curtis Mann (Mann) lived at Budget Apartments in Rolla. On June 8, 2010, they were standing outside talking when Defendant drove up. They witnessed him driving a black Toyota 4Runner with an Illinois license plate that had letters and then the number "1." Defendant backed up to the dumpster, looked at Gann and Mann, threw trash bags into the dumpster and drove away.

Gann and Mann returned to their respective apartments. Mann came back to the dumpster with his own trash. He found Victim's belongings in the garbage bags Defendant had thrown into the dumpster, including Victim's purse with a wallet and credit cards. Mann went to Gann's apartment and told him what Mann had found. The garbage bags also contained women's clothing and shoes. Gann called the police. Both Gann and Mann identified Defendant in a photo lineup.

Officer Jessie Hoyt (Officer Hoyt) went to the apartments. She found Victim's identification in the purse. Officer Hoyt gave the purse to dispatch and asked that Victim be contacted to retrieve her purse. Trina Duarte (Duarte) was in charge of lost and found at the Rolla Police Department. She tried to locate Victim. When Duarte couldn't reach Victim, she called Defendant as his information was in the purse, listed as an emergency contact. She spoke with Defendant three times on June 8th and once on June 10th. Duarte said that Defendant

3

volunteered a lot more information than was typical for simply returning property, and Duarte thought this was unusual and odd.

Later on June 8, 2010, Defendant visited Smith in Illinois. They began making plans for Smith, their daughter, and Smith's mother to move into Defendant's home in Meta. Defendant appeared tense. He was driving a black Toyota 4Runner with license plate GNBRD 1.

While at Smith's home, Defendant received a phone call. Defendant told Smith that the call was from the Colorado State Police, and that Victim was missing and her purse had been found in a dumpster.

On June 14, 2010, Sheriff Harold Heitman (Sheriff Heitman) of Maries County took a missing person report from Defendant about Victim. Defendant said that he hadn't seen her since June 8th at about 9:30 a.m., when she had asked him to go to Walmart in Rolla to get personal hygiene items for her. Defendant said he bought those items and gave them to her. Defendant then told the sheriff that Victim had: (1) several other boyfriends and was probably running around with one of them; (2) left several times previously, but always returned when she ran out of money; (3) cashed out her 401K that had $30,000; (4) several different passports and that if she didn't want to be found, she wouldn't be found until she ran out of money; and (5) taken personal items including clothes and makeup.

Sheriff Heitman entered Victim into MULES as a missing person. He also made missing-person posters and placed them throughout the county, and notified the media.

In July 2010, there was a search of the home where Defendant and Victim had been living. The home was processed as a crime scene. The bedroom in the basement had blood stains on the west wall that appeared to have been cleaned. The wall had been rubbed so hard that the paint had been rubbed off and the drywall exposed. There were "swipe marks" on a

4

picture frame and a photo collage. The blood stains came from the direction of the bed. When the bed was pulled away from the wall, blood splatter on the lower part of the wall was revealed. There were 30 to 70 blood stains on the wall, as well as blood stains on the mattress. The mattress pad was new. When the mattress was flipped over it revealed a sizeable blood stain on the bottom of the mattress and a rip on the mattress near the stain. There was a deformed bullet inside the mattress.

On November 16, 2010, Darin Lackman (Lackman) was hunting in Maries County when he saw something white in the woods. It was behind a shed on the property owned by Lydia Allred. When Lackman went to take a closer look, he saw that it was a white blanket. He saw a bone sticking out of the blanket and realized that it didn't look like an animal bone. He unrolled the blanket with his gun barrel and saw a human skeleton. Lackman called his wife, who called 911. The sheriff's department responded.

The remains were wrapped in bedding. Victim was wearing a t-shirt, underwear and socks, and she was wrapped up in a mattress pad and a fitted king-size sheet. There were also three pillows with cases on them. There were three expended shell casings with the remains. The three cartridge cases were fired from the same weapon.

A forensic pathologist, Dr. Russell Deidiker (Dr. Deidiker), examined the bedding from the home, including the mattress. He said that the blood stains were from Victim based on DNA testing. He determined that, based on the amount of blood, the gunshot would have been fatal without medical care.

Dr. Deidiker also examined the remains, which were almost completely skeletonized with a small amount of dried-out tissue on some of the bones. The remains were relatively complete and were those of a Caucasian female between 5'2" and 5'8" and 30 to 40 years old. There were

defects in the right shoulder blade, right ribs and the spinal column from being shot. The bullet went from back to front consistent with being shot in the back. Dr. Deidiker compared the remains with Victim's dental records and found them to be consistent. The doctor testified that the remains were those of Victim and that Victim died from gunshot wounds.

Mark Beary (Beary), a forensic anthropologist, completed a biological profile and trauma analysis of Victim's remains. The skeleton was that of a 5'6" Caucasian female who was 38.2 years old, with a standard deviation of 10.9 years. The remains were skeletonized and had been exposed to the environment for a period of time. The exposure was consistent with having been there from June to November.

Beary found four areas of trauma on the skeleton. Each of the injuries was probably caused by a different bullet. Beary determined that, conservatively, there were three bullets, but there may have been four. If a bullet entered Victim but did not hit bone there would have been no evidence of it in the forensic review. Beary also found a fetal bone with the remains. The fetus' femur was less than an inch long. Beary opined the fetus was between 16 to 17 weeks old.

Tommy Wilcox (Wilcox) was in jail with Defendant in April 2011. According to Wilcox, Defendant said he was accused of murdering his girlfriend, whom Defendant described as "a piece of shit." Defendant also told Wilcox that: (1) Victim was a drug addict, she ran around on him, and that he hated her; (2) Defendant and Victim had a child and that Defendant was concerned that she would leave with the child to go overseas; (3) Victim's body was discovered on a piece of property that was connected to his mother; (4) Defendant regretted not getting rid of the body; (5) Victim had a .380 and that Defendant had a .357 and that the police would not be able to connect him to the gun used in the murder; (6) Defendant had been seen putting Victim's purse in the dumpster in Rolla; (7) the last time he saw Victim she was getting

6

in a black car with an accountant from Colorado; and (8) Defendant went to Illinois to visit his daughter and that he saved his receipts so he could prove where he was.

Defendant was found guilty of murder in the first degree and ACA. The trial court imposed consecutive sentences of life in prison without the possibility of parole on the murder conviction and 100 years in prison on the ACA conviction. This appeal followed. Additional facts will be included below as we discuss Defendant's three points on appeal.

*Point I*

Defendant's first point contends the trial court plainly erred in accepting his waiver of counsel and permitting him to proceed *pro se*. The following facts are relevant to this point.

Defendant's request to represent himself was addressed at five hearings before trial in this case. The matter was first addressed at a hearing held in November 2012, then at three hearings held in September 2013, and finally at another hearing held in April 2014.

At the first hearing on November 27, 2012, the court addressed the public defender's motion to withdraw. Defense counsel explained that the motion was based on a letter Defendant sent to the court that contained allegations concerning her representation. Defense counsel thought that the letter effectively discharged her. Defendant explained that he was not asking that counsel be relieved. The motion to withdraw was denied.

The next hearing, on September 9, 2013, was set to discuss discovery issues. At that hearing, Defendant announced that he wanted to dismiss his attorney and proceed *pro se*. He was concerned that the workload for the Public Defender's Office negatively impacted his representation and that he could provide a better defense. He asked that he be transferred to the Maries County Jail, where he would have access to a telephone, internet, email, printer, research

7

and the ability to conduct interviews. Defendant stated that "I deserve the opportunity to defend my life to my best abilities."

In response, the State suggested that if the court was considering Defendant's request to represent himself, a *Faretta* hearing would be required.[2] The court denied Defendant's request to dismiss his attorney, explaining that Defendant had been well represented and that the court did not want another continuance. The court granted Defendant's request to transfer him to the Maries County Jail so that he could assist in his defense. The issue of Defendant representing himself was set for the next day.

At that September 10th hearing, the court asked Defendant if he wished to represent himself alone. Defendant replied that he would "need assistance for procedural, but yes, that is my wish." Defendant then testified that he: (1) completed two associate's degrees and other college courses; (2) understood he had a right to an attorney; (3) had not been threatened or pressured to waive his right to representation; (4) was making this decision voluntarily and of his own free will; (5) knew the charges and the range of punishment, and that knowing the charges and range of punishment, he still wanted to represent himself; (6) understood that, if he represented himself, he could not later object to the way he carried out that representation or complain that he didn't understand or have the legal knowledge to do so; (7) understood that he would be required to follow the rules of procedure and evidence; (8) knew that he would be responsible for preparation of the case including legal research, investigation and interviewing witnesses; (9) understood that being incarcerated would affect his ability to prepare for trial; (10) understood that he alone would have to pay for expert witnesses and transportation; (11) understood it was generally unwise for a person to represent himself; and (12) requested that

---

[2] *See Faretta v. California*, 422 U.S.806 (1975).

current counsel, Matthew Crowell (Crowell), not be discharged but appointed as "second chair" or "standby" counsel. After Defendant testified, the court denied Defendant's request to represent himself. The court considered: (1) the limited time before trial, then set the following month in October 2013; (2) defense counsel's diligent efforts to represent him; and (3) that the public defender was paying for an expert witness and other expenses. The court suggested that defense counsel give Defendant a more active role in his representation.

The State then filed a motion requesting that the court reconsider Defendant's request to represent himself. Defense counsel also filed a motion for a continuance of the jury trial. A hearing on both motions was held September 30, 2013. Defendant argued that it was his fundamental right to represent himself. He confirmed his understanding that his request to represent himself was done freely and voluntarily, and that he understood that he would be held to the same standard as an attorney. Defendant again stated that he wanted to proceed *pro se* and also have Crowell "stay in the case" to keep Defendant from making procedural errors. The court initially denied Defendant's request to represent himself, finding that his request was equivocal.

Crowell then requested that he be appointed standby counsel. The prosecutor agreed and argued that Defendant should be designated as representing himself *pro se* with Crowell as standby counsel, explaining that was the only way for Defendant to decide his own theory of the case and strategy. The trial court was persuaded and ordered that Defendant could represent himself and that Crowell remain as standby counsel. The court explained:

> [Defendant] is going to be the lead attorney. He's going to determine the course of his own case as he has repeatedly demanded. And he made that request today again. And in light of the court's cases, I believe that he has that right and determination, even though the Court strongly again would urge him to reconsider his own thoughts on this. And in accordance with those cases, I'm giving him what he asked for.

9

The court also granted a continuance, setting the trial for April 2014.

On April 14, 2014, a week before trial, the issue of Defendant's self-representation was addressed a fifth time. Crowell asked the court for clarification of his role at trial. He was concerned with what his role would be if Defendant decided at trial that he was not capable of representing himself. Crowell noted, however, that after observing Defendant for the last few months, he found that Defendant would likely be capable of representing himself. The court agreed that Defendant seemed prepared to represent himself and that he had done an "extraordinary amount of research and discovery."[3] The court directed that Crowell continue to be available to answer procedural and other questions as needed.

Thereafter, Defendant conducted his own defense at trial, with Crowell participating primarily in side-bar conferences. In his motion for new trial, Defendant did not claim that the trial court erred in allowing him to proceed *pro se* during trial.

On appeal, Defendant concedes he did not preserve this claim for review and requests that this Court review for plain error. Rule 30.20 provides, in pertinent part, that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted." *Id*.; *State v. Garth*, 352 S.W.3d 644, 652 (Mo. App. 2011). In determining whether to exercise our discretion under the plain error rule, this Court looks to determine whether on the face of the defendant's claim substantial grounds exist for believing the trial court committed a "plain error" which resulted in manifest injustice or a miscarriage of justice. *Garth*, 352 S.W.3d at 652. The defendant bears the burden

---

[3] The legal file in this case contains numerous *pro se* filings by Defendant, including several motions, legal authority in support of those motions, and responses to the State's motions.

of showing that the alleged error has produced such a manifest injustice, and "[m]ere allegations of error and prejudice will not suffice." *Id.*

Defendant's first point contends the trial court plainly erred in accepting his waiver of counsel and permitting him to proceed *pro se*, "because [his] waiver was not found to be knowing, intelligent and voluntary[.]" Defendant argues that immediately after determining his "waiver was 'equivocal,' the court decided that it was 'giving him what he asked for,' and appointed defender Crowell as standby counsel, without determining that [Defendant's] waiver was knowing, intelligent and voluntary," which requires this Court to reverse and remand for a new trial. We disagree.

The Sixth Amendment right to counsel "implicitly embodies a correlative right to dispense with a lawyer's help." *Faretta v. California*, 422 U.S. 806, 814 (1975) (internal quotation marks omitted). *Faretta* rights are not infringed when standby counsel is appointed to ensure a *pro se* defendant's compliance "with basic rules of courtroom protocol and procedure." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Participation of standby counsel during trial does not interfere with a defendant's right to self-representation, provided that the defendant still had control over his case, and that standby counsel's participation did not detract from defendant's appearance of control over his *pro se* defense. *Id*. at 184-88; *State v. McMillon*, 436 S.W.3d 663, 669 (Mo. App. 2014); *see Faretta*, 422 U.S. at 834 n.46 ("a State may – even over objection by the accused – appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary"); *see also State v. Black*, 223 S.W.3d 149, 156 (Mo. banc 2007) ("[i]n capital cases where the defendant insists on representing himself, standby counsel should usually be appointed"). When Crowell requested that he be appointed

11

standby counsel, he relied on our Supreme Court's suggestion to do so in **Black**. After further consideration of Defendant's persistent requests for standby counsel to help with procedural matters, the trial court agreed.

"There are four requirements for a defendant seeking to waive his right to counsel and proceed pro se." **Black**, 223 S.W.3d at 153. A defendant's invocation of the right must be: (1) timely; (2) unequivocal; (3) knowing; and (4) intelligent. **Id**.; *see State v. Murray*, 469 S.W.3d 921, 925-26 (Mo. App. 2015). In this case, Defendant's point does not argue that his waiver of counsel was untimely or equivocal, but argues only that it was not "knowing and intelligent."

In **Murray**, the eastern district of this Court recently emphasized the importance of these two factors and summarized considerations for their analysis:

> Whether to allow a criminal defendant to waive the right to counsel is one of the most sensitive rulings a trial court must make. A criminal defendant will likely appeal either decision. Whether a defendant's waiver is made knowingly or intelligently depends on the particular facts and circumstances of the case. This test considers the background, experience, and conduct of the defendant. While there is no rigid procedure or script to follow, a trial court should explore certain areas of inquiry to ensure the waiver is knowing and intelligent. First, a trial court should inquire into the defendant's capacity to make an intelligent decision and his knowledge of his own situation. Second, a trial court should make certain that the defendant understands the possible penalties if convicted. Third, a trial court should be sure that the defendant understands exactly what rights and privileges the defendant is waiving and the dangers associated with waiving constitutional rights.

**Murray**, 469 S.W.3d at 926-27 (internal quotation marks and citations omitted); **Black**, 223 S.W.3d at 154-56. Defendant claims that the trial court erred in making this determination in two respects, that the court failed to: (1) "warn him that, in spite of his efforts, he cannot

12

afterwards claim inadequacy of representation"; and (2) advise him "of the types of defenses he could offer at trial."[4] We find no merit in either argument.

As to the first argument, Defendant's claim is refuted by the record. At the September 10, 2013 *Faretta* hearing, among the litany of considerations discussed, Defendant acknowledged that, if he represented himself, he could not later object to the way he carried out that representation or complain that he didn't understand or have the legal knowledge to do so.[5]

With respect to the second argument that the trial court failed to advise him of the types of defenses he could offer at trial, we reject that argument for the same reasons stated in *State v. Garth*, 352 S.W.3d 644 (Mo. App. 2011). There, the eastern district of this Court addressed a similar argument citing the same cases, explaining:

> None of the cases cited by Appellant hold that the singular failure to advise the defendant of the possible defenses to his charged crime merits reversal and, in any event, they are all distinguishable from the case at bar because each one features a complete lack of record or a substantial paucity of information about the perils of representing oneself given by the court to the defendant. A lack of information given or inquiry made could not be more *non* descriptive of the situation in the

---

[4]   In support of his argument concerning the trial court's failure to advise him of defenses, Defendant cites *State v. Davis*, 934 S.W.2d 331, 334 (Mo. App. 1996); *State v. Schnelle*, 924 S.W.2d 292, 298 (Mo. App. 1996); and *State v. Wilson*, 816 S.W.2d 301, 305 (Mo. App. 1991).

[5]  The following is part of the colloquy between the trial court and Defendant:

> Q.  Do you understand that if you take it upon yourself to represent yourself, that anything you do you cannot later object to?  Do you understand that?

> A.  Yes.

> Q.  If you make a mistake, if you say something that would allow evidence to come in, that might otherwise not have come in, you can't complain later that you didn't understand or you had – you didn't have the legal knowledge?

> A.  Yes, Your Honor.

13

case below, where the trial court's repeated detailed explanation to Appellant of his right to counsel, the advantages of accepting appointed counsel, the gravity of waiving counsel and the seriousness of the charges against him extended over a four-month period at four different hearings.

*Id*. at 653-54 (italics in original).[6]

As in ***Garth***, the trial court here thoroughly examined Defendant with respect to his request to represent himself over several months at multiple hearings. The court elicited testimony from Defendant that he had earned two associate's degrees, completed other college courses and had the capacity to make an intelligent decision. Defendant further demonstrated that he knew and understood the gravity of his own situation. The court advised Defendant, in detail, of the multiple perils of representing himself, and personally advised him on several occasions not to represent himself. The court further made sure Defendant understood exactly what rights and privileges he was waiving, and dangers associated with waiving those rights. Throughout, Defendant resolutely stated his desire to proceed *pro se*, requesting that Crowell be appointed as standby counsel to assist him with procedural issues. The trial court ultimately gave Defendant what he repeatedly and consistently requested. Moreover, the court also granted his request to transfer to the Maries County Jail to accommodate Defendant's use of a computer and internet in preparing his defense. Given the record before us, we find no error, plain or otherwise, in determining Defendant's waiver of counsel was knowing and intelligent. Accordingly, Point I is denied.

---

[6]  The ***Garth*** court further noted that "a requirement that the trial court give detailed advice to the defendant as to possible defenses would place the trial court in the position of counsel for the defendant and would require the trial court to conduct an investigation in order to determine what defenses would be applicable." *Id*. at 654. "Such a far-reaching requirement would be untenable and would in fact be contrary to the role of the court as an impartial arbiter." *Id*.

*Point II*

Defendant's second point contends the trial court abused its discretion in overruling his motion for a mistrial after a witness briefly displayed an unrelated weapon. The following facts are relevant to this point.

The weapon, a .357 revolver, was in a box that was marked State's Exhibit 14 and had been admitted during the testimony of Corporal Mertens. In addition to the revolver, the box contained a bullet fragment. Corporal Mertens discussed the bullet fragment, but not the revolver.

Evan Garrison (Garrison), the State's firearm expert, was asked about State's Exhibit 14. The following exchange occurred:

> [PROSECUTOR]: I want to start by having you open up Exhibit No. 14, which the top is already opened and 14 has already been admitted. That was the first testing that you did. And I want you to open up Exhibit No. 14 and explain to the jury what Exhibit No. 14 is specifically?
>
> THE WITNESS: With the Court's permission, I'm gonna check this revolver, confirm it's an [sic] unloaded condition.
>
> THE COURT: You certainly may.
>
> MR. FRITZ: Objection, Your Honor. If I may approach?
>
> THE COURT: You may.
>
> (COUNSEL AND PRO-SE DEFENDANT APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HELD.)
>
> MR. FRITZ: The revolver itself has not presented or entered into evidence at this time. And the witness drawing the revolver out of a box in front of the jury is overtly prejudicial. For the simple fact that I own a weapon, that is not the murder weapon to be presented as evidence is –
>
> [PROSECUTOR]: It is marked as –

15

MR. FRITZ:  It goes to character.  Just stating that I – because I own a weapon and using that as evidence, that's – I would also ask relevance.  The simple fact that I own a weapon, that is not the murder weapon.

[PROSECUTOR]:  Judge, it is part of Exhibit No. 14.

THE COURT:  There's been no introduction of it.

MR. FRITZ:  It's overtly – no introduction of the revolver.

[PROSECUTOR]:  It is part of his testimony that that was a part of the testing.  And he's simply right now making sure that it's not loaded.

I didn't know that he was gonna do that.  But, Judge, I will go through a line of questioning that is – that is not the revolver that was utilized in the case and it was not a revolver that the Defendant claimed to use or even own.

But at this point now I'm assuming that he was – it was taken into evidence during the search warrant.

THE COURT:  But it's not an issue from the search warrant?

[PROSECUTOR]:  No.

THE COURT:  I don't remember a warrant about the weapon.

[PROSECUTOR]:  No.

THE COURT:  He has submitted in his tests on the gun and what his tests were and there's nothing on the gun?

[PROSECUTOR]:  Well, he did cross-compare it to the cartridges that were expended.

MR. FRITZ:  But nothing has been introduced at this point.

THE COURT:  But there's nothing about the weapon that's been introduced about where it was found or where it – what the source of the –

[PROSECUTOR]:  I – I – that's correct, Judge.  I – that's correct. I mean, I do intend to get into that this was part of the testing that he did.

MR. FRITZ:  And then that would bring the – the point that the foundation for the revolver has not been laid at this point.

[PROSECUTOR]:  I can lay the foundation for the revolver.

16

THE COURT:  Not with this witness.

[PROSECUTOR]:  What's that?

THE COURT:  Not with this witness.

[PROSECUTOR]:  I can have him put it back in the box.

MR. FRITZ:  That's – that's – that's asking an 80-pound gorilla to –to step out of the room.

THE COURT:  Well, I'm gonna sustain the objection at this time. There's nothing – there's been no testimony about the weapon.

MR. FRITZ:  Your Honor, I would ask for an instruction to the jury to disregard the showing of the revolver.

[PROSECUTOR]:  That's fine.

THE COURT:  Okay. Sustained.

MR. FRITZ:  Thank you, Your Honor.

(THE PROCEEDINGS RETURNED TO OPEN COURT.)

THE COURT:  The objection is sustained.  The jury will disregard the previous question.

At the close of the State's evidence, Defendant requested a mistrial.  That request was denied. Defendant renewed his request for a mistrial at the close of all the evidence.  That request was also denied.

Defendant contends the trial court should have granted a mistrial.  "Declaring a mistrial is a drastic remedy that should only be employed in those extraordinary circumstances in which the prejudice to a defendant can be removed in no other way."  *State v. Dorsey*, 156 S.W.3d 791, 803 (Mo. App. 2005).  The decision whether to declare a mistrial rests largely within the trial court's discretion because "the judge has observed the incident that precipitated the request for a mistrial and is in a better position than an appellate court to determine what prejudicial effect, if

17

any, the incident had on the jury." *Id*.; *see State v. Smith*, 32 S.W.3d 532, 552 (Mo. banc 2000). Defendant's point argues that because Garrison's display of the unrelated weapon was "not, in any way, connected to the crime [and] inherently prejudicial," the trial court abused its discretion in overruling his requests for a mistrial. We disagree.

Defendant did not request a mistrial until after the State had rested its case. "It is the responsibility of counsel to request a mistrial." *Foster v. State*, 348 S.W.3d 158, 163 (Mo. App. 2011). If counsel fails to make such a request, it will be assumed that counsel is satisfied with the measures taken by the trial court. *Id*. "A subsequent request for a mistrial or other additional measures is untimely." *Id*. Therefore, our review is for plain error only pursuant to Rule 30.20. *Foster*, 348 S.W.3d at 163. As previously indicated, plain error is found only where the alleged error establishes substantial grounds for believing manifest injustice or a miscarriage of justice has resulted from the trial court error. *Id*.; *see Garth*, 352 S.W.3d at 652. "A miscarriage of justice or manifest injustice arises from the improper admission of evidence when that evidence had a decisive effect on the jury's verdict." *State v. Tripp*, 168 S.W.3d 667, 677-78 (Mo. App. 2005) (internal quotation marks and citation omitted); *State v. Hightower*, 951 S.W.2d 712, 717 (Mo. App 1997). A "decisive effect" means that there is a reasonable probability that, in the absence of the challenged evidence, "the verdict would have been different." *Smith*, 32 S.W.3d at 552; *State v. Overton*, 261 S.W.3d 654, 663 (Mo. App. 2008).

Defendant cannot show that the brief display of the revolver played a decisive role in the determination of his guilt. The evidence established that Defendant had an intimate relationship with Smith, and he invited Smith to move into the home he was currently sharing with Victim. Victim was murdered in the bed she shared with Defendant. Defendant purchased new bedding for that bed, and lied to police that he purchased personal hygiene items for Victim. Thereafter,

18

Defendant disposed of Victim's personal items in a dumpster in Rolla. Additionally, it was established that Victim was murdered with a gun as there was a deformed bullet inside the mattress, three shell casings found with her remains, and both Dr. Deidiker and Beary discussed trauma that had been caused to Victim's bones from being shot. The jury was aware that Victim was shot and therefore, briefly viewing a gun would not have had a decisive effect on the jury's verdict. The display of the revolver was also uninvited, and the prosecutor did absolutely nothing to emphasize the action. Further, the trial court sustained Defendant's objection and instructed the jury to disregard the revolver. We presume that the jury properly followed the trial court's instructions in rendering its verdict. *State v. Chavez*, 128 S.W.3d 569, 578 (Mo. App. 2004). In sum, Defendant has failed to show a reasonable probability that, in the absence of viewing the revolver, the verdict would have been different. *See Hightower*, 951 S.W.2d at 717 (absent showing decisive effect on jury verdict, plain error relief not warranted). Therefore, the trial court did not commit plain error in denying Defendant's motions for a mistrial. *See Foster*, 348 S.W.3d at 163. Point II is denied.

*Point III*

Defendant's third point contends the trial court abused its discretion in overruling his objections and allowing the admission of evidence regarding the discovery of fetal bones found with Victim's remains. The following facts are relevant to this point.

Defendant filed motions to exclude evidence of the fetal bones, which the court overruled. At trial, Defendant was the first to elicit testimony concerning fetal bones during cross-examination of Lieutenant Dorothy Taylor (Lieutenant Taylor):

Q. And if you could detail for us the – what exactly transpired that day?

A. It was at [Beary's] request. He wanted to go to the scene himself. And we decided we would wait until the weather cleared and made it a little more passable. So we set a date to go. I believe it was the – around the first of June,

19

maybe the second of June, something of that nature of 2011. And he requested to bring a class. He teaches forensic science and asked to bring – or forensic anthropology and asked to bring his class. And the reason that he wanted to go back to the scene – did you want me to tell why he wanted to go back?

Q. Yes.

A. When he officially identify – when he initially looked at the remains, he discovered a fetal bone – what he believed to be a fetal bone and, therefore, asked us if he could go back to the scene because he was – to see if he could find another or any others. And so we certainly said that was certainly something we could do. And so we arranged that and he asked to bring his class and we obviously said that was fine as well.

During Beary's direct examination, Defendant objected to any testimony from Beary about the fetal bones. The court overruled Defendant's objection on the ground that the evidence of the fetal bones was part of the *res gestae* of the case and relevant to motive.

A trial court has broad discretion to admit or exclude evidence offered at trial, and a ruling on the admission of evidence will be reversed on appeal only if the court "clearly abused its discretion." *State v. Jackson*, 313 S.W.3d 206, 210 (Mo. App. 2010). This Court reviews "for prejudice, not mere error," and will reverse "only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id*.

Generally, evidence must be both logically and legally relevant to be admissible. *State v. Barriner*, 111 S.W.3d 396, 400 (Mo. banc 2003). Evidence is logically relevant if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case. *Id*. at 400-01. Evidence is legally relevant if the probative value outweighs "costs" such as "prejudice, confusion of the issues, undue delay, waste of time or cumulativeness." *Id*. at 401. In addition, "[n]o criminal trial or judgment should be affected, in any manner, by an error committed at the instance of the defendant." *State v. Williams*, 118 S.W.3d 308, 313 (Mo. App. 2003); *State v. Campbell*, 122 S.W.3d 736, 742 (Mo. App. 2004) (defendant is not entitled to complain about

matters brought into the case by his own questions or take advantage of self-invited error); § 545.030.1(16).

Defendant's point argues the trial court abused its discretion in admitting evidence of the fetal bones found with Victim's remains because "the evidence had no probative value in proving the element of the alleged crime of murder, and the prejudicial effect of the evidence served only to inflame the passions of the jury …." We disagree for several reasons.

First, the evidence concerning the fetal bones was logically relevant because it helped confirm that the skeletal remains were those of Victim and establish when she was murdered. Victim was reported last seen alive on June 7, 2010, and was reported missing by Defendant on June 14, 2010, but her remains were not discovered until November 16, 2010. Victim visited the obstetrician on June 7, 2010, when it was determined that she was approximately 16 weeks pregnant. The forensic anthropologist who did a biological profile and trauma analysis on the remains determined that the fetus was between 16 and 17 weeks old. This evidence established that Victim was murdered in early June 2010, and was therefore logically relevant. Evidence of the fetal bones was also legally relevant because its probative value outweighed its costs and did not result in undue prejudice, particularly given the substantial evidence of Defendant's guilt.

Second, the fetal bones also were part of the *res gestae* of the case. The term *res gestae* includes "the surrounding facts … explanatory of an act or showing a motive for acting" and "matters incidental to a main fact and explanatory of it … without a knowledge of which the main fact might not be properly understood." **State v. Davis**, 226 S.W.3d 167, 171 (Mo. App. 2007). In this case, the fetal bones were admissible as part of the *res gestae* of this case as evidence of Victim's pregnancy to show: (1) motive; and (2) a complete and a coherent picture of the crime. *See, e.g.*, **State v. Williams**, 366 S.W.3d 609, 624 (Mo. App. 2012).

21

Third, the first evidence about fetal bones was elicited by Defendant himself during his cross-examination of Lieutenant Taylor. *See **State v. Myers***, 248 S.W.3d 19, 25 (Mo. App. 2008) (noting that a defendant's cross-examination can open the door for the State to present additional evidence on a subject, even if it would otherwise be inadmissible). Therefore, any error was self-invited and cannot be the basis for overturning the judgment in this case. *See **Campbell***, 122 S.W.3d at 742.

For all these reasons, we find no abuse of discretion in admitting evidence of the fetal bones. Accordingly, Point III is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

DANIEL E. SCOTT, P.J. – CONCUR

DON E. BURRELL, P.J. – CONCUR