

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | WD83720 |
| v. | ) | |
| | ) | |
| ERIC DEWANE BUSEY, | ) | FILED: December 21, 2021 |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
### THE HONORABLE PATRICK K. ROBB, JUDGE

### BEFORE DIVISION THREE: LISA WHITE HARDWICK, PRESIDING JUDGE, GARY D. WITT, AND EDWARD R. ARDINI, JR., JUDGES

Eric Busey appeals from his conviction of unlawful use of a weapon and sentence of 15 years in prison. Busey contends the circuit court erred in finding that he was not competent to act as his own attorney because he did not knowingly and intelligently waive his right to counsel and in denying his motion for acquittal in that the guilty verdict was unsupported by the evidence. Busey further contends that the circuit court's imposed sentence of a statutorily required 15-year prison term was excessive, or, in the alternative, that the statute is unconstitutional. For reasons explained herein, we affirm.

FACTUAL AND PROCEDURAL HISTORY

The evidence adduced at trial was that on April 30, 2019, Busey approached Roy Ewing and Tammy Puckett, who were exiting their vehicle at a convenience store. Busey began "hollering" at Puckett and demanded that she return a television monitor that he had left at her former residence. Busey demanded to follow Ewing and Puckett to Puckett's new apartment to get the monitor. Puckett did not want Busey to know where she lived.

Ewing and Puckett started to back their vehicle away from Busey, prompting Busey to run to a parked white vehicle, enter the driver's side door, and chase Ewing and Puckett. Another man got into the passenger side of Busey's vehicle before Busey gave chase. Eventually, as Busey pursued the pair, Ewing heard gunshots coming from Busey's vehicle. Busey claimed that a passenger in his vehicle, Shoddran Page, fired a gun from the car in order to "put some pep in [Ewing and Puckett's] step." Ewing sped up, as did Busey in pursuit, to speeds of 75 to 80 miles per hour. Ewing heard more gunshots come from Busey's vehicle. A third-party witness to the chase also testified that the gunshots appeared to come from Busey's vehicle. Eventually, the chase ended when a passenger in Busey's car told him to break off the pursuit. Ewing and Puckett drove to a police station, where they reported the incident.

The State charged Busey with the unlawful use of a firearm as a prior persistent offender. Prior to trial, Busey was represented by a court appointed assistant public defender. On June 18, 2019, Busey announced that he wanted to

represent himself. The hearing court granted his request. At a subsequent hearing before a new judge, Busey asked the court to again appoint him counsel and told the court that he could not afford to hire counsel on his own. When the hearing reconvened later in the day, the same assistant public defender who had previously represented Busey entered his appearance on Busey's behalf.

On October 18, 2019, Busey filed a motion to remove his counsel but noted that he still wanted to be represented by counsel outside of the public defender's office. Busey filed a second motion for new counsel on October 21, 2019. In that second motion, he stated: "I am asking for and requesting legal counsel (attorney). I don't want to represent myself! I just want a lawyer who is not going to make sexual (homosexual passes) at me!!" At another hearing on November 15, 2019, while still awaiting the court's ruling on his motions, Busey then asked to represent himself in his upcoming trial.

Busey, a member of the sovereign citizen movement, routinely challenged the circuit court's authority to hear his case through arguments based on admiralty law and the UCC. After another outburst challenging the court's jurisdiction at the November 15, 2019 hearing, the circuit court ordered that Busey undergo a mental competency evaluation to determine his competency to stand trial. The court ruled that Busey would continue to be represented by his appointed counsel until the evaluation was complete and his motions were resolved.

3

The mental competency evaluation was filed with the court on January 9, 2020. The evaluation indicated that Busey was competent to stand trial. It also acknowledged that he suffered from antisocial personality disorder "characterized by a pervasive pattern of disregard and violation of the rights of others, since at least the age of 15 years, as well as a failure to conform to social norms, deceitfulness, impulsivity, reckless behavior, irresponsibility, and lack of remorse." The evaluator further reported that Busey displayed a specific paranoia toward the legal system.

At a subsequent hearing on January 17, 2020, the court again took up Busey's request to represent himself. There, the court noted Busey's alternating stances on wanting to represent himself versus wanting appointed counsel. The court also walked Busey though a written waiver of counsel form, which Busey acknowledged he did not understand in the following exchange:

> THE DEFENDANT: No, I certainly do not understand [the waiver form].
>
> THE COURT: What do you not understand about—
>
> THE DEFENDANT: I don't understand it.
>
> THE COURT: Okay. Well, I can read it to you and answer—
>
> THE DEFENDANT: I just read it myself. You can go ahead and read it yourself.
>
> THE COURT: Well, I need you to—
>
> THE DEFENDANT: I don't understand it.
>
> THE COURT: Well, you read it; right?

4

THE DEFENDANT:  Yeah, I read it.  I don't understand.

THE COURT:  What do you not understand about it?

THE DEFENDANT:  I don't understand what it says.  I don't understand it.

THE COURT:  Okay. Well, if it-- I can explain it to you.

THE DEFENDANT:  Well, you can explain it.  I don't understand.

THE COURT:  Why don't you hand it back to me, [counsel].  Let's go through this.  Do you understand that you're charged with the—

THE DEFENDANT:  I don't understand.  No, I do not understand.

THE COURT: Well, you're not letting me finish the—

THE DEFENDANT: I don't understand the charges.

THE COURT:  Okay.  So it states here, "I understand that I am charged with the offense of unlawful use of a weapon."  You're indicating you do not understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Secondly in the paragraph-- in the defendant's waiver of right that I provided to you and you've read it says, "I understand that I have a right to trial and this right includes a right to trial by jury."  Do you not understand that?

THE DEFENDANT:  I understand I have a right to trial, yes.  I don't understand the charges.

THE COURT:  Okay.  So Paragraph 1 you do not understand that you're charged with the offense of unlawful use of a weapon; is that correct?

THE DEFENDANT:  Yes.  I don't understand it.

THE COURT:  All right.  And the third paragraph is that "I understand that the maximum possible sentence on this charge"—

5

THE DEFENDANT: I don't understand it. I read it.

THE COURT: Well, let me finish.

THE DEFENDANT: I mean, I read it.

THE COURT: I know, but it doesn't make sense. We're making a record here.

THE DEFENDANT: Oh, okay. Go ahead.

THE COURT: It doesn't make sense if you're responding to "I understand"-- and you say, "No, I don't" because there's never a question there. It doesn't make sense—

THE DEFENDANT: Proceed, Your Honor.

THE COURT: All right. "I understand"-- in Paragraph 3, "I understand the maximum possible sentence on the charge is 15 years imprisonment in the Department of Corrections and the minimum sentence is 5 years in the Department of Corrections. "I also understand if the Court finds that I am a persistent offender that the range of punishment will be a minimum of 10 years up to a maximum of 30 years in the Department of Corrections or life imprisonment in the Department of Corrections." Do you understand that?

THE DEFENDANT: No, I don't understand it.

THE COURT: What do you not understand about it?

THE DEFENDANT: I don't understand none of it.

THE COURT: Okay.

THE DEFENDANT: The only thing I understand is I have a right to a fair trial. That's it.

THE COURT: All right.

THE DEFENDANT: Everything else in there I don't understand.

THE COURT: And 4, it says, "I understand that if I plead guilty to or if I am found guilty of the charged offense, the Judge is most likely to impose a sentence of confinement." Do you understand that?

THE DEFENDANT: No.

THE COURT: All right. You understand, Mr. Busey, that you do have the right to have the assistance of counsel at this trial?

THE DEFENDANT: I waive that right.

THE COURT: Yes, I understand that. I heard that. But you understand you have the right to have counsel and you do have counsel in this case? You understand that; right?

THE DEFENDANT: No, I don't have counsel.

THE COURT: Okay.

THE DEFENDANT: I am my own counsel.

THE COURT: Do you understand that acting as your own attorney, you will be opposed by an experienced prosecutor and neither the – myself or the prosecutor will help you during the trial as to how to ask questions –

THE DEFENDANT: You're not helping me now, so why would I expect you to help me then?

THE COURT: Okay. Do you understand that?

THE DEFENDANT: No, I don't.

THE COURT: Okay. Do you understand that if you fail or refuse to follow the proper procedure and engage in improper conduct such as behaving in a rude, vulgar, or obnoxious way such as when you left the courtroom this last court hearing, the trial will stop and you will not be allowed to remain in the courtroom? Do you understand that?

THE DEFENDANT: I hear you.

THE COURT: All right. So do you understand that?

7

THE DEFENDANT:  No, I do not.

THE COURT:  Okay.  Do you understand that if you represent yourself, you'll have to ask questions and present evidence in accordance with technical legal rules and if you don't follow those legal rules the Court will direct you not to do so?  Do you understand that?

THE DEFENDANT:  Objection, Your Honor.  I have legal documentation right here and you are ignoring my legal documentation that the judge needs to – I mean, the judge and the State needs to prove its jurisdiction.  You haven't proven jurisdiction.  And once it is challenged, it must be proven.  The paperwork is right here.

THE COURT:  Okay.  And again, I'll let you file your paperwork at the end of this hearing.

THE DEFENDANT:  I already – I already filed that.

THE COURT:  Okay.

THE DEFENDANT:  I already filed – where's the motion that I already filed with the Court?  I already filed the challenge of jurisdiction.

THE COURT:  Yes.  I made reference to it. You filed it November 15th –

THE DEFENDANT:  Okay.

THE COURT:  – titled "Lack of Jurisdiction."

THE DEFENDANT:  Yes.  Have you proven your jurisdiction?

THE COURT:  So that's what you're making reference to.  Yes.  Yes, and you asked for dismissal of the case as a result of that.

THE DEFENDANT:  Yeah.  Can you please prove – can you please prove jurisdiction?  Please, Your Honor.

THE COURT:  Yeah.  That request is denied.

8

After a brief outburst from Busey over the denial of his ongoing jurisdictional challenge, Busey continued to affirm that he did not understand the court's additional questions pertaining to his rights and circumstances. The circuit court then denied Busey's request to represent himself while establishing the following record:

> THE COURT: The Court at this time finds that the defendant, although competent to be a defendant in a criminal case as determined by the Court-ordered mental evaluation filed with the Court on January 9th, 2020, the Court finds and determines he is not competent to represent himself. Specifically the Court finds that the defendant is competent, understands his right to counsel in this case; however, he does not understand his full range of rights nor does he understand the consequences of his desire –
>
> THE DEFENDANT: Objection.
>
> THE COURT: – to represent himself –
>
> THE DEFENDANT: Objection, Your Honor.
>
> THE COURT: Okay. Mr. Busey, do not interrupt me. You can make a record at the end of my statement. Okay? Do not interrupt me again or you're going to be excluded from the courtroom. That's a warning. Specifically, the Court finds that the defendant is competent and understands his right to counsel in this case; however, he does not understand his full range of rights nor does he understand the consequences of his desire to represent himself. I specifically find that the defendant has not intelligently and voluntarily waived his right to be represented by counsel and for the Court to allow the defendant to represent himself in this case would be a violation of due process. In making these findings, I make reference to several communications of the defendant to the Court that are contained in the court file, along with the mental evaluation of the defendant received by the Court on January 9th, 2020 that support the Court's denial of the defendant's request to represent himself.
>
> First, the defendant in his communications with the Court has indicated that he does not want to represent himself, that he instead wants a different attorney. This was reflected in his communications with the Court dated

9

November 7th, 2019 and also earlier communications and correspondence with the Court that are contained in the Court's file.

This request of the defendant seems to be partially based on defense counsel not doing what he wants and a belief that his defense counsel will in some way sabotage his case. This is reflected in writings of October 21, 2019 and November 7, 2019. Specifically, he has written to the Court his displeasure with his defense attorney and having him submit to a deposition in the case and his demand that defense counsel not take any depositions of witnesses in the case in preparing the case for trial. The Court is referring to the defendant's communication with the Court received October 21, 2019 as well as other statements made by defendant in his communication with the Court.

The defendant's displeasure in his attorney's plan to take depositions of individuals in preparing the case for trial appear (sic) to be based on partially the misconception by the defendant that his attorney is doing this in order to sabotage his case. And this is based, again, on what appears to be the defendant's belief that the taking of depositions in preparation of trial does not assist him, but instead his belief that the taking of depositions will help the State by allowing them to admit the depositions at trial as an exception to the hearsay rule. This statement from the defendant is contained in his correspondence to the Court received on December 5th, 2019.

In addition, this stated belief by defendant in his correspondence with the Court is consistent with the findings of the evaluator contained in the mental evaluation of the defendant received by the Court on January 9th of this year in which the evaluator noted a history by the defendant of documented symptoms of paranoia and during the current evaluation the evaluator noted the defendant's current state of paranoia regarding the legal system.

The Court notes that defendant has been upset with his attorney's advice and actions from his attorney's refusal to file a motion to dismiss that the defendant went on to file and upon review by the Court provides no basis for relief of dismissal of the case prior to trial as requested in his motion. Again, I think it was dated October 30th, 2019.

The defendant's attorney advised defendant that there was no merit in his motion to dismiss and that the Court would not grant such a motion. In response, the defendant filed the motion to dismiss on his own on October 31, 2019. The Court, upon review of the motion to dismiss, defendant refers

10

to this motion as a motion for summary judgment. The Court has previously advised the defendant that this is not a proper motion in a criminal prosecution, but rather it is a possible motion in a civil proceeding.

THE DEFENDANT:  Civil court.

THE COURT: The defendant does not accept this information from the Court and evidently from his attorney, but instead when provided this information from the Court and advice from counsel he draws the conclusion that his attorney is attempting to sabotage his defense to the charge he is defending himself from.

The defendant's correspondence to the Court dated November 7th, 2019 shows the defendant's anger, reflects the defendant's anger with his attorney's failure to file motions and prove his innocence prior to trial.  Also at the conclusion of our last hearing, defendant exhibited his anger at what he was being told by the Court by yelling and screaming in the courthouse while being escorted back to the jail and calling the court bailiff the devil.

Also in defendant's correspondence received November 7th, 2019, the defendant exhibits his belief that his attorney is sabotaging his case again and helping the State in the prosecution of him by deposing witnesses in preparation for trial.  The Court, after reviewing the defendant's motion to dismiss filed by the defendant –

THE DEFENDANT:  Deposing witnesses that I didn't call.

THE COURT:  Right.

THE DEFENDANT:  Yeah, right.

THE COURT:  Let me finish this Mr. Busey.  The Court, after reviewing the defendant's motion to dismiss filed by the defendant on October 30, 2019 finds no basis for the Court to grant the motion to dismiss before trial and evidence as presented on – and evidence has been presented on the case.  The Court infers from the defendant's correspondence to the Court that the attorney has previously advised him this before he filed the motion on his own.  On November 15, 2019, as we've discussed this afternoon, the defendant filed with the Court a writing titled "Lack of Jurisdiction" pursuant to the UCC requesting that the Court dismiss his case on the grounds of lack of jurisdiction. In this filing with the Court, the defendant declares his sovereignty and challenges the Court's admiralty maritime

11

jurisdiction against the prosecutor alleging, among other things, that this Court is operating 10 miles outside of its geographical venue. In this filing with the Court, the defendant goes on to state that he is very confused and does not understand how and when he committed a maritime crime and entered into an international contract. The Court finds that the defendant has little to no understanding of criminal procedure and trial procedure, including accomplice liability which the State may –

THE DEFENDANT: Objection.

THE COURT: Okay. I'll let you talk at the end; which the State may submit the case to the jury based on this legal concept of law. Defendant has no or little understanding of requesting jury instructions, including –

THE DEFENDANT: Objection.

THE COURT: – the authority to request the submission of lesser-included offenses for the jury's consideration in this case. In addition, to allow the defendant to proceed to trial without counsel when the defendant is basing his decision to proceed to represent himself in part because of the misconception that his attorney is working against him and trying to help the prosecution, this misconception has no basis and fact. And as the Court has indicated, this belief –

THE DEFENDANT: Objection.

THE COURT: As indicated – And Mr. Busey, I've directed you three times not to interrupt me. So please follow my directions. This misconception by the defendant has no basis and fact. And as the Court has indicated, this belief by the defendant appears to be a manifestation of the defendant's paranoia that is discussed in the defendant's mental evaluation received by the Court and reflected in many of the defendant's own writings to the Court. As a result, the Court has determined that the defendant has not intelligently and voluntarily waived his right to counsel and that as a result of his mental illness and thought processes, he is not competent to conduct trial proceedings –

THE DEFENDANT: Objection.

12

THE COURT: – by himself. And for the Court to allow the defendant to waive his right to counsel would represent – excuse me. And to allow the defendant to waive his right to counsel would result in a denial of due process to him.

Before trial, Busey was found to be a prior persistent offender and records of his prior offenses were admitted into evidence. Busey was subsequently tried and found guilty based on aiding or encouraging the shooting under an accomplice theory of culpability. At the sentencing hearing, Busey asked the court to ignore the mandatory 15-year prison term that Section 571.030.9(3)[1] required the court to impose. Instead, Busey asked the court to impose a five-year prison term on the grounds that the Section 571.030.9(3) violated the Eighth Amendment's prohibition on cruel and unusual punishment. The circuit court denied the request, and imposed the statutorily required sentence of a 15-year prison term. Busey appeals.

## ANALYSIS

Before reaching the merits of Busey's appeal, we must address our jurisdiction to hear this appeal in light of Busey's challenge to the constitutionality of a state statute, which, if properly made, would render this case under the exclusive jurisdiction of our Supreme Court. *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 52 (Mo. banc 1999). "When an appellant challenges the constitutionality of a statute, we must first determine whether the issue was preserved for appeal, and if so, whether we have jurisdiction to decide the issue

---

[1] All statutory references are to the Revised Statutes of Missouri 2016, unless otherwise indicated.

13

or must transfer the case to the Supreme Court." *In Interest of M.J.M.*, 553 S.W.3d 327, 335 (Mo. App. 2018).

In Point III, Busey asks that we find Section 571.030.9(3) unconstitutional under the Eighth Amendment's prohibition against cruel and unusual punishment. He also asks that we find that the circuit court erred in imposing the statutorily mandated sentence. Even if we ignored the direct constitutional challenge and only considered whether the circuit court erred, we must necessarily consider the constitutional implications because Section 571.030.9(3) imposes a mandatory sentence as opposed to a discretionary sentence. Thus, because of the mandatory nature of the statute, even Busey's as applied challenge, if successful, would necessarily implicate that the statute itself was unconstitutional. Therefore, we are bound to first consider whether Busey raised a timely constitutional challenge below, and, if so, whether he raises a real and substantial, not merely colorable, claim warranting transfer to our Supreme Court. *M.J.M.*, 553 S.W.3d at 335. We find that we retain jurisdiction of the case because Busey failed to properly preserve this issue for appeal by failing to raise his constitutionality challenge at the earliest possible moment, and because his claim is not real and substantial.

First, on the issue of timeliness, neither party has provided a case with substantially similar facts to those before us, nor do we find any. The State relies on *M.J.M.*, in which we held that, "where the application of a statute 'could hardly have been a surprise to appellants,' appellants' raising a constitutional challenge

14

to the statute for the first time in a post-trial motion was too late." *Id.* (quoting *Hollis v. Blevins*, 926 S.W.2d 683, 684 (Mo. banc 1996)). In *M.J.M.*, the appellant, in a post-trial motion, challenged the constitutionality of Section 211.447.5(2)(a) and 5(3)(c), which required the circuit court to consider and make findings on the appellant's mental condition. *Id.* We found, in part, that because the petition referenced the statute as grounds for the termination of the appellant's parental rights, that there was no reason she should not have been aware of the statute and could not have raised her constitutional challenge earlier. *Id.* at 336.

The State relies on our decision in *M.J.M.* to assert that Busey similarly could have hardly been surprised that Section 571.030.9(3) applied to him, and thus could have raised his challenge earlier. We agree. The parties do not dispute that Busey was charged as a prior persistent offender under Section 571.030 in the information, and he therefore should have been aware that Section 571.030.9(3)'s mandatory 15-year prison term was the only possible sentence that the circuit court could impose. The circuit court also made the specific factual finding that Busey was a persistent offender before trial, at which point Busey had no reason to doubt Section 571.030.9(3)'s applicability if found guilty. Finally, Busey waited nearly two months after trial, up to the moment immediately preceding the imposition of his sentence, to raise a general and abbreviated challenge to the statute. Throughout the period after trial, Busey was on notice that Section 571.030.9(3)'s mandatory sentence was now directly applicable to him, barring a drastic change in his circumstances. We note that "[a]n attack on

15

the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an afterthought in a post-trial motion or on appeal." *M.J.M.*, 553 S.W.3d at 336 (quoting *Land Clearance for Redevelopment Auth. of Kansas City, Mo. v. Kansas Univ. Endowment Ass'n*, 805 S.W.2d 173, 175 (Mo. banc 1991).

On appeal, Busey concludes that he timely raised his challenge because he waited until after the court ruled on his motion for new trial, but he does not support that conclusion further with fact or law. Ostensibly, Busey argues that he waited until all opportunity for an acquittal had been foreclosed before challenging the sentence. We, again, dealt with a similar situation in *M.J.M.,* as we found that the appellant should have known that, "if the court found termination to be appropriate," then it would be required to make findings on her mental condition pursuant to the challenged statute. *Id.* In including the conditional phrase "if the court found termination to be appropriate," we essentially concluded that the appellant in *M.J.M.* had no requirement to wait until the court *actually found* that termination of her parental rights was appropriate. Under that same logic, and because the information gave Busey reason to be aware of the exact terms of his sentence at the inception of his case, it is consistent to hold that Busey need not have waited until all possibility of acquittal was extinguished to raise his challenge. Given the unique circumstances and the mandatory nature of the sentence, we cannot say that Busey could have

been surprised in any way at the applicability of Section 571.030.9(3) such that he could not have raised his constitutional challenge far sooner.

Even if Busey had timely raised his constitutional challenge, however, his argument is not "real and substantial" to warrant transfer. "[A] mere assertion that a statute is unconstitutional does not deprive the court of appeals of jurisdiction." *Glass v. First Nat. Bank of St. Louis, N.A.*, 186 S.W.3d 766 (Mo. banc 2005). "The constitutional issue must be real and substantial, and not merely colorable." *Id.*

Busey acknowledges the rarity with which our Supreme Court finds mandatory sentences to be "grossly disproportionate," which is what he must show to succeed in his challenge. *See State v. Denzmore*, 436 S.W.3d 635, 644 (Mo. App. 2014). Nevertheless, he supports his argument on the ground that the circuit court stated at the sentencing hearing that it believed the penalty was disproportionate. The State argues, and we agree, that the circuit court's comments are nonbinding and a far cry from dispositive in any analysis. The only other argument that Busey offers in support of his constitutional claim is his unsupported and conclusory allegation that the statute must be unconstitutional because the circuit court lacked the discretion to consider Busey's conduct in imposing his sentence. Indeed, Busey fails to argue the specific facts of his case or to supply more than generally applicable case law in support of his contention. Without more, Busey has not demonstrated a real and substantial constitutional

17

challenge that is not merely colorable. Consequently, we deny transfer to the Supreme Court and retain jurisdiction to hear this appeal.

Having considered Busey's constitutional challenge, we turn to the remainder of Busey's third point, in which he asks us to find that the circuit court erred imposing the 15-year sentence. First, as discussed above, given that the sentence was statutorily required, making such a finding would necessarily implicate the constitutionality of the statute itself. Second, the circuit court correctly found that it had no discretion to alter a statutorily mandated sentence. Thus, even if we could hold that the circuit court erred without implicating a constitutional challenge, the circuit court did not err by way of adhering to the plain language of the statute. Point III is denied.

In Point I, Busey contends the circuit court erred in denying his request to represent himself. "There are four requirements for a defendant seeking to waive his right to counsel and proceed pro se." *State v. Fritz*, 480 S.W.3d 316, 324 (Mo. App. 2016) "A defendant's invocation of the right must be: (1) timely; (2) unequivocal; (3) knowing; and (4) intelligent." *Id*. Busey argues that court erred in finding his request was not equivocally and intelligently made.

While we question the equivocality of Busey's request based on the shifting stances expressed in his motions and communications with the court, we need not discuss equivocality at length because Busey's request was neither knowingly nor intelligently made.

> Whether a defendant's waiver is made knowingly or intelligently depends on the particular facts and circumstances of the case. This test considers the background, experience, and conduct of the defendant. While there is no rigid procedure or script to follow, a trial court should explore certain areas of inquiry to ensure the waiver is knowing and intelligent. First, a trial court should inquire into the defendant's capacity to make an intelligent decision and his knowledge of his own situation. Second, a trial court should make certain that the defendant understands the possible penalties if convicted. Third, a trial court should be sure that the defendant understands exactly what rights and privileges the defendant is waiving and the dangers associated with waiving constitutional rights.

*State v. Leonard*, 490 S.W.3d 730, 740 (Mo. App. 2016) (internal quotation marks and citations omitted). Busey argues that his "persistent requests to self-represent coupled with the intelligence of his pleadings . . . demonstrate a knowing and intelligent waiver." He further supports his argument with case law indicating that he need not sign a waiver form for his waiver of the right to counsel to be knowingly and intelligently made. The issue here, however, is not that Busey failed to sign a waiver; rather, the issue is that he did not demonstrate his understanding of his rights and the situation.

At the January 17, 2020, hearing, the circuit court asked a multitude of questions directed at gauging Busey's understanding of his rights, the trial process, and the circumstances at hand. To nearly all of those inquiries, Busey unequivocally responded that he did not understand the legal concepts that the court was explaining. Nevertheless, Busey relies on *State v. Davis*, 507 S.W.3d 41 (Mo. App. 2016), and *State v. Ndon*, 583 S.W.3d 145 (Mo. App. 2019), to support his contention that he waived his right to counsel knowingly and intelligently.

19

Neither case is dispositive on the issue before us, however. In both cases, the defendants refused to directly answer the courts' inquiries as to their understanding of their rights and privileges, so the courts' questioning offered no insight. *Davis*, 507 S.W.3d at 43; *Ndon*, 583 S.W.3d at 151-152. In contrast, Busey did directly answer nearly all of the circuit court's questions by unequivocally responding with various iterations of, "I do not understand." Thus, unlike the facts in *Davis* and *Ndon*, the circuit court had clear and relevant responses from Busey on which to make its findings. The circuit court's robust record also highlights Busey's often belligerent conduct, his demonstrated lack of awareness of court procedure, his unwillingness or inability to understand the laws under which he was charged, his great disrespect for the court, and his mental competency evaluation, which evinces an inability to change his conduct in the future. Under these uncomplicated facts, the circuit court did not err in finding that Busey had not knowingly and intelligently waived his right to counsel. Point I is denied.

In Point II, Busey contends that the circuit court erred in denying his motion for acquittal because the record lacks substantial evidence to support the jury's finding that he aided his passenger in shooting a firearm from a vehicle. "Substantial evidence is evidence from which the trier of fact could reasonably find the issue in harmony with the verdict." *State v Kimes*, 234 S.W.3d 584, 586 (Mo. App. 2007). "Because it is the fact-finder's duty to weigh the evidence and determine the credibility of witnesses, we accept as true all evidence favorable to

20

the State and all reasonable inferences drawn therefrom, and we disregard all evidence and inferences to the contrary." *Id*. at 586-87.

Busey first argues that the language of the information precludes any finding that he assisted or encouraged the shooting. Specifically, Busey asserts that, because he was charged with shooting a firearm "from" a vehicle and not "at" Ewing's and Puckett's vehicle, he cannot logically have accomplice culpability. For instance, Busey asserts that a person could fire a weapon from within a stationary vehicle without a driver and still fire "from" a vehicle. Therefore, he contends, adding a driver to those facts does not logically aid or encourage shooting "from" a vehicle. The logic behind this argument is skewed and unpersuasive. The argument ignores that, although Busey was charged with firing "from" a vehicle and not "at" a vehicle, the circumstances demonstrate that scaring Ewing and Puckett was the overall purpose behind firing a weapon in the first place. Thus, had Busey, as the driver, not closely pursued the obviously fleeing Ewing and Puckett at high rates of speed, his passenger's incentive to shoot a firearm from the vehicle would have been entirely diminished. Consequently, Busey's driving not only aided and encouraged the shooting, but the shooting likely would not have happened at all but for his driving.

Busey attempts to paint his circumstances as those in which any unknowing and law-abiding driver would have accomplice culpability if their passengers unexpectedly shot a firearm from the vehicle. We disagree. Busey did more than merely drive, as he contends; instead, the record contains sufficient evidence to

21

find that he actively chased Ewing and Puckett at high rates of speed as they turned onto various streets in their attempt to flee. The record also demonstrates that Busey continued the high-speed pursuit even after the first shots were fired, supporting a reasonable inference that he acquiesced and voluntarily aided in furthering his passenger's conduct. Given these facts in the record, the circuit court did not err in denying his motion for acquittal. The record contains substantial evidence to support the factual finding that Busey aided or encouraged the charged conduct. Point II is denied.

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

22