Lisa White Hardwick, Judge
K.M.U. ("Mother") appeals the judgment terminating her parental rights to her son, M.J.M. ("Son"). She contends the circuit court erred in applying the termination of parental rights statute in a manner that violates federal law and is unconstitutional. Mother also argues that the evidence was insufficient to support terminating her parental rights on the bases of neglect, failure to rectify, and unfitness to be a party to the parent and child relationship. She further asserts that the evidence was insufficient to support the court's findings that termination of her parental rights was in Son's best interest. Lastly, Mother argues that the court erred in admitting and relying upon evidence of a sexual assault that was perpetrated against her. For reasons explained herein, we affirm.
FACTUAL AND PROCEDURAL HISTORY
On appeal, we view the evidence and all reasonable inferences therefrom in the light most favorable to the judgment. In re Adoption of H.D.J.K. , 336 S.W.3d 516, 517 n.2 (Mo. App. 2011). The evidence at trial was that Son was born on August 3, 2013, and resided with Mother and his maternal grandmother ("Grandmother"). During the first two months of his life, Son was admitted twice to Children's Mercy Hospital after being diagnosed with failure to thrive.
On October 4, 2013, the Juvenile Officer filed a petition alleging that Son's failure to thrive diagnoses were the result of Mother's neglect. Son was placed in protective custody. Following a hearing in January 2014, the court entered a judgment finding that Mother had neglected Son by failing to provide the proper and necessary nutritional, medical, and other support necessary for his well-being. Specifically, the court found that Mother was repeatedly unable to demonstrate proper feeding of Son, refused assistance from the Division, and failed to cooperate with Children's *330 Mercy Hospital Home Health Services. The court found that on two separate occasions, doctors attributed Son's failure to thrive to Mother's refusing to feed the child sufficient food by continuously refusing to adhere to a strict feeding schedule that doctors had directed her to follow. The court noted that, when Mother properly fed Son in the hospital as directed by the doctors, the child gained more than adequate weight. The court found that, after Son was hospitalized for the second time for failure to thrive, Mother immediately refused to follow the strict feeding schedule prescribed by the doctors upon discharge and, in doing so, placed his health in danger. Therefore, the court determined that Son was in need of care, assumed jurisdiction over him, and placed him in foster care.
Mother entered into a written service agreement with the Children's Division ("the Division") containing three goals. The first goal was for Mother to learn how to appropriately care for Son by working with and maintaining a parent aide. The second goal was for Mother to learn how to manage her emotions and not put her family in danger. To do so, she was to have a neuropsychological evaluation, participate in individual therapy, and manage her anger. The third goal was for Mother to be able to care for herself and her family by doing laundry, submitting an application for Social Security and Medicaid, and pursuing employment assistance.
Mother's Mental Health Conditions
Mother was initially evaluated by three medical professionals, all of whom found that she suffers from several mental health conditions. Dr. Mary Richardson, a licensed psychologist, performed a psychological evaluation and parenting assessment on Mother in February 2014. Richardson concluded that Mother suffers from Post-Traumatic Stress Disorder ("PTSD"), stuttering, and mild intellectual disability. Richardson expressed concerns about Mother's mood swings, her inability to manage her emotions effectively, her anger management problems, and the fact that she functions at a sixth-grade level academically. Richardson recommended that Mother receive psychiatric care, therapy, anger management, vocational rehabilitation, resources from Parents as Teachers, mental health assistance, and financial assistance. Richardson also recommended that Mother receive a parenting aide or parenting classes to help her learn how to assure Son's safety, learn about early childhood socialization, follow doctor's orders, and learn coping skills.
A second psychologist, William McDonnell, gave Mother a neuropsychological evaluation in July 2014. McDonnell concluded that Mother displays cognitive and social delays that indicate serious impairment in a number of areas. McDonnell found that Mother's ability to learn new information was measured as impaired, she does not utilize any refined learning strategies, she does not internally organize her approach to problem solving, she misses relevant details of verbal and visual information and makes mistakes based on those errors, she does not take in and hold information in her mind as well as other adults, and she cannot mentally review the information she has heard to assure she understands expectations. McDonnell indicated that Mother would require external support, guidance, and direction in many areas of her daily life and that she may not make financial, social, or vocational choices effectively or safely. McDonnell stressed the importance of Mother's working with a parent aide and receiving individual counseling.
A psychiatrist, Dr. Mairaj Khan, performed a psychological evaluation on Mother in August 2014. Khan diagnosed *331 Mother with PTSD, major depressive disorder, mood disorder, learning disorder, impulse-control disorder, and mild mental retardation. He placed Mother's intellectual functioning at a fifth or sixth grade level and noted that Mother's decisional capacity is very poor, and she gets easily frustrated. Khan expressed concern for the choices that an individual with these diagnoses would make for themselves and opined that there is a greater likelihood that a child dependent upon that individual would not be in a safe environment. Khan attempted to provide psychiatric care for Mother as part of the Partial Hospital Program, in which individuals receive medication and mental health care and education for six hours a day, five days a week. Mother did not agree with Khan's diagnoses, however, so she resisted taking the medication. She objected to any redirection. Mother was discharged from the program for non-compliance and non-attendance.
Mother's Anger Management and Domestic Violence Issues
Mother has a history of exhibiting a lack of anger management and impulse control. Prior to Son's birth, Mother was on probation for assaulting Grandmother by slapping her in the face. Grandmother had to be transported to the emergency room due to the assault. After the court took Son into protective custody, Grandmother called the police in October 2014 because Mother was verbally abusive, pushed a table toward her, and blocked her from leaving the house. Following that incident, Grandmother stated that she was scared to do anything in her own home because Mother's behavior dictated what she could and could not do.
Mother continued physically abusing Grandmother. According to Grandmother, she has, at times, been scared of Mother because she is afraid that Mother will hit her. Grandmother has had to barricade herself in her room on multiple occasions, as recently as November 2016, due to her fear of Mother. Mother has also physically prevented Grandmother several times from leaving either a room or the house.
On August 27, 2015, the police were called when Mother pushed Grandmother in the chest after Grandmother refused to pay Mother's child support. Mother refused to comply with the police officer's instructions, resisted arrest, and assaulted the officer by kneeing the officer in the leg and attempting to kick him. Mother had to be subdued by restraints and was arrested. She was incarcerated from August 28, 2015, through September 3, 2015, and was charged with assault and domestic violence. Mother had the option of proceeding in criminal court or participating in the mental health court program. She chose to participate in the mental health court program.
Mother's Progress in Mental Health Services
Mother had several mental health therapists after the court took jurisdiction over Son. Brandy Haddock was Mother's first weekly therapist, from January 2014 to May 2015. Mother frequently cancelled appointments with Haddock. Haddock noted that Mother did not want to take her medication or take direction from a parenting aide. Haddock stated that Mother made "little progress" on her anger management and impulse control issues. Haddock rated Mother's progress on coping skills over the course of her therapy at twenty percent. Haddock said that she would be concerned for a child in Mother's home because of Mother's anger management issues and the domestic violence incidents that occurred in Mother's home. After Mother let her Medicaid lapse, Mother was discharged from Haddock's care. Mother's therapist from July 2015 to November *332 2015, Tajsheena Leggs, also expressed concerns about Mother's anger management and impulse control.
Mother's third therapist, Mackenzie Sainz, began working with Mother in January 2016. Mother frequently cancelled her appointments with Sainz. Mother exhibited paranoid behavior to Sainz. On one occasion, Mother told Sainz that "DFS commits medical kidnapping of babies for monetary gain and DFS has killed people." After working with Mother for a year, Sainz rated Mother's progress on her treatment goals at a three or four out of ten.
When Mother chose the mental health court program in lieu of proceeding in criminal court for her assault and domestic violence charges in December 2015, she actually engaged and participated in mental health services that she had previously refused when those services were offered by the Division. She began regularly seeing a mental health nurse practitioner for medication management, and she attended individual therapy and family therapy with Grandmother. After Mother graduated from the mental health court program in May 2016, however, Grandmother contacted Mother's therapist out of concern that Mother was not retaining the coping skills necessary to manage her anger.
Mother's Relationship with Parent Aides and Case Manager
In the three and one-half years that the court had jurisdiction over Son before Mother's parental rights were terminated, Mother had five different parent aides. Mother frequently complained about her parent aides, was argumentative with them, and refused to listen to their directions regarding how to properly feed and care for Son. Two of Mother's parent aides left due to a poor working relationship with Mother, while two other parent aides left for reasons unrelated to Mother.
Only one of Mother's parent aides, Wendy Bevan, recommended that Mother receive unsupervised visitation. Bevan was Mother's parent aide from August 11, 2014 to October 27, 2014. Bevan recommended that Mother receive short periods of unsupervised time "sandwiched" in the middle of supervised visits. After Bevan recommended this, however, she expressed concern that Mother and Grandmother had not been transparent with her about all of the domestic violence issues in the home.
None of Mother's other parent aides recommended that Mother receive unsupervised visitation. Indeed, several of Mother's supervised visits resulted in phone calls to the police due to concerns for the parent aide's or Son's safety. During a supervised visit on November 29, 2014, Mother refused to listen to her parent aide, Wynona Martin, regarding how to feed Son. Mother began yelling and screaming at Martin and told her that she would not be leaving with Son, so Martin called the police. During another supervised visit on December 21, 2014, Mother refused Martin's direction to put Son in his crib to sleep. Again, Mother yelled and screamed at Martin, and Martin called the police because she felt like she could not take Son and leave safely. During a supervised visit on December 30, 2014, attended by Martin and Mother's Division caseworker, Alisa Connelly, Mother began making physical and verbal threats. Mother yelled that Son should never have come into care and that the Division was trying to steal her child. The situation escalated, and Connelly called the police. Per the police dispatcher's directions, Connelly locked herself and Son in the bathroom. Mother was banging on the door with such force that Connelly had to put her back to the bathroom door to protect Son in case the door broke. Visits were suspended after this incident until the court ordered *333 therapeutically supervised visits, but the start of those visits was delayed because Mother kept cancelling her personal therapy sessions.
After Mother's therapeutically supervised visits ended, Martin insisted that the visits occur in the community instead of in Mother's home. During a June 4, 2015 visit at Independence Center, Martin decided to end the visit early due to Mother's inappropriate behavior and non-compliance with Martin's directions. Mother began yelling at Martin and then, when Martin attempted to leave with Son, Mother screamed multiple times in the crowded mall that Martin was "stealing [her] baby." Mall security and the police intervened, and Martin was eventually allowed to leave with Son. Martin declined to work with Mother after this incident. Mother's anger and outbursts were constant safety concerns for Martin, and Martin stated that she would be concerned for the safety of Son and any adult who supervised visits between Son and Mother.
Mother continued to be verbally abusive to her next parent aide, Erin Waterhouse. In addition to cursing at her in person, Mother sent Waterhouse several angry, expletive-filled text messages in the summer of 2016 after Mother disagreed with the manner in which Waterhouse intended to reschedule Mother's missed visitation. This caused Waterhouse to have concerns about Mother's ability to control her emotions and manage her anger. Based upon Mother's inability to care for herself and her anger issues, Waterhouse believed that Mother had not developed the parenting skills or the mental capacity to safely and adequately care for Son's mental, physical, and medical needs now or in the reasonably foreseeable future.
Connelly served as Mother's Division case manager. Throughout the case, Mother frequently did not allow Connelly to make home visits, did not return Connelly's phone calls, and at times, refused to release information to the Division. Connelly characterized her communication with Mother over the course of the three and one-half years as "very strange and very difficult." Mother told Connelly that she believes Son was taken from her because the State gets money for adopting kids out. When Connelly told Mother that was not true, Mother reacted with anger, rage, and disbelief. Moreover, Connelly noted that, when Mother flies into a rage, she "doesn't really have control." Connelly related one incident where, during a supervised visit, Son did something that Mother did not like. According to Connelly, Mother yelled at Son and "took it out on him in an inappropriate way for a child his age." Connelly believed Mother's lack of impulse control, lack of anger management, and lack of understanding about Son's developmental abilities would put Son's safety at risk if Son were left unsupervised with Mother.
Other Services Provided to Mother
The Division made extensive efforts to help Mother receive Medicaid, Social Security, food stamps, parent education, employment assistance, vocational rehabilitation, and housing assistance. Mother either refused the services, delayed applying for them, failed to follow through with her applications, or let the services lapse. At the time of trial, Mother had reapplied for Medicaid but was not yet receiving it. Connelly struggled to get Mother to participate in services and believed that Mother's actions did not demonstrate progress toward parenting Son.
Mother's Financial Responsibility
Mother is financially dependent upon Grandmother, who has health issues and does not have a will. Mother does not pay rent, bills, or any household expenses and, until recently, did not help with household *334 chores. Mother does not have a car and does not drive. She does not work. Although she is capable of being employed and finding employment, she has refused job offers and assistance from persons trained to help her find employment.
Mother's monthly child support obligation was $50. From March 2014 to January 2017, Mother made two child support payments totaling $700. At the time of trial, she was $1000 in arrears. Mother did not think it was fair for her to have to pay child support while Son was in the State's custody. In over three years, Mother provided Son's foster family with only a couple of jackets, shorts, and shirts, but did not provide any other necessities.
Mother's Ability to Exercise Good Judgment
Connelly expressed concern over Mother's ability to exercise good judgment. While the case was pending, Mother met and had some type of relationship with three men over the internet. She had a year-long, volatile, long-distance relationship with one of the men, C.B., whom she never met in person. During this relationship, Mother would tell Connelly that C.B. was emotionally abusive and controlling but would later say that she planned to move herself and Son in with C.B. At one point, Mother posted on Facebook that she was married to C.B., which was not true. After the court ordered that Son have no contact with C.B., Mother asked her parent aide if she could make a Skype call to C.B. during a visit with Son. The parent aide told Mother that she could not, but Mother hid under the table and made the Skype call to C.B. during the visit anyway. Mother was aware that she was violating the court's no-contact order, but she "wanted [Son] and [C.B.] to see each other."
Son's Current Care and Future Needs
Son was diagnosed with microcephaly and is delayed in both his speech and physical development. With his foster family, who wants to adopt him, Son has gained weight and has received speech, occupational, educational, and physical services and therapies. Son attends a developmental preschool, receives special education services, and has an Individualized Education Plan. At some point in the future, he will need to see a neurologist and be monitored for seizures.
Son's condition is not temporary and would regress without services. According to Mother, if Son were returned to her care, she would have Grandmother help her work with Son on his speech issues. As for his other developmental issues, Mother said she would deal with them by taking Son to a doctor to "see what is going on with him." Mother has never inquired as to whether Son could obtain the special services he is currently receiving if he moved into her school district, and she was unable to articulate any specific plan for ensuring that Son continued to receive the services he needs.
Termination Proceeding
The Division filed a petition to terminate Mother's parental rights on February 5, 2016. Trial was held over six days in January, February, and March 2017. The court terminated Mother's parental rights in May 2017.
In its judgment, the court found clear, cogent, and convincing evidence to terminate Mother's parental rights on three grounds: (1) Mother has neglected Son, pursuant to Section 211.447.5(2);[1] (2) Son has been under the court's jurisdiction for over one year and the conditions that led to the assumption of jurisdiction still persist, or conditions of a potentially harmful *335 nature continue to exist, pursuant to Section 211.447.5(3); and (3) Mother is unfit to be a party to the parent-child relationship pursuant to Section 211.447.5(6)(a). As part of its findings to support termination under Sections 211.447.5(2) and 211.447.5(3), the court found that Mother suffers from mental health conditions that prevent her from providing the necessary care, custody, and control of Son. The court noted that Mother has not made any discernable progress in improving her conditions, is unable to appreciate the severity of her conditions, and poses a serious safety risk to Son if he is left unsupervised in her care. After concluding that three grounds existed to support termination, the court further found that termination of Mother's parental rights is in Son's best interest. Mother appeals.
ANALYSIS
Constitutional Challenge
Mother's Points I and II challenge the validity of Section 211.447.5, the termination of parental rights statute. In Point I, she contends the statute violates Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. In Point II, Mother contends subsections 5(2)(a) and 5(3)(c) of 211.447, the provisions that require the court to consider and make findings on the parent's mental condition when terminating on the basis of abuse and neglect or failure to remedy, violate her constitutional rights to due process and equal protection.
After Mother filed her Appellant's brief, the Division filed a motion to transfer the case to the Missouri Supreme Court. We took the Division's motion with the case. Mother also requests that we transfer the case to the Supreme Court.
When an appellant challenges the constitutionality of a statute, we must first determine whether the issue was preserved for appeal, and if so, whether we have jurisdiction to decide the issue or must transfer the case to the Supreme Court. Young v. Pitts , 335 S.W.3d 47, 54 (Mo. App. 2011). To properly preserve a constitutional issue, it must, among other things, "be raised 'at the earliest possible moment consistent with good pleading and orderly procedure.' " Id. (quoting State v. Turner , 48 S.W.3d 693, 696 (Mo. App. 2001) ).
Mother did not raise her challenges to the validity and constitutionality of Section 211.447.5 at the earliest possible opportunity. She was aware, since the filing of the petition on February 5, 2016, that two of the three grounds on which the Division was seeking to terminate her parental rights were subsections 5(2) and 5(3) of Section 211.447. Thus, she was also aware that, if the court found termination to be appropriate on either of those grounds, it would be required to consider and make findings on her mental conditions pursuant to subsections 5(2)(a) and 5(3)(c) of Section 211.447. Indeed, the petition cited these subsections and included specific allegations about her mental conditions. Nevertheless, Mother did not file any pre-trial motions challenging the validity of Section 211.447.5, and she did not assert the issue during the six-day trial.
The Supreme Court has held that, where the application of a statute "could hardly have been a surprise to appellants," appellants' raising a constitutional challenge to the statute for the first time in a post-trial motion was too late. Hollis v. Blevins , 926 S.W.2d 683, 684 (Mo. banc 1996). In Hollis , the Court found that the appropriate time for the appellant to raise a constitutional challenge to the joint and several liability statute "would have been in the answer to the tort petition, which named more than one defendant." Id. Similarly, in *336 Land Clearance for Redevelopment Authority of Kansas City, Missouri v. Kansas University Endowment Association , 805 S.W.2d 173, 175 (Mo. banc 1991), the Court found that the appellants could not have been surprised by the circuit court's utilization of the statutory interest rate and, therefore, any constitutional challenge to the statute could have been asserted before judgment instead of in a post-trial motion. In so holding, the Court explained that "[a]n attack on the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an afterthought in a post-trial motion or on appeal." Id. at 176.
There was no reason why Mother could not have raised her challenges to the validity of Section 211.447.5 earlier. Therefore, those challenges have not been preserved for appellate review. Accordingly, we are not required to transfer the case to the Missouri Supreme Court or to address Mother's claims. See Young , 335 S.W.3d at 55 ; Turner , 48 S.W.3d at 697. The Division's motion to transfer is denied, as are Mother's Points I and II.
Grounds for Termination of Parental Rights
In Points III through VII, Mother contends the evidence was insufficient to support terminating her parental rights on the bases of neglect, failure to rectify, and parental unfitness. To terminate parental rights, the circuit court must find clear, cogent, and convincing evidence of one or more of the grounds for termination in Section 211.447. In re Q.A.H. , 426 S.W.3d 7, 12 (Mo. banc 2014). Whether there is clear, cogent, and convincing evidence is reviewed under the standard of Murphy v. Carron , 536 S.W.2d 30 (Mo. banc 1976). In re J.A.R. , 426 S.W.3d 624, 626 (Mo. banc 2014). Consequently, we will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Murphy , 536 S.W.2d at 32. Substantial evidence of only one of the grounds for termination is enough to affirm the judgment on appeal. Q.A.H. , 426 S.W.3d at 12.
To determine the sufficiency of the evidence to support the judgment, we view the evidence and inferences therefrom in the light most favorable to the circuit court's judgment, deferring to its credibility determinations and resolutions of conflicts in the evidence. J.A.R. , 426 S.W.3d at 626. In doing so, we "recognize that the circuit court is free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence through its own perspective." Id. at 627.
Because they are dispositive, we will first address Mother's Points V and VI, which challenge the sufficiency of the evidence to support the court's determination that termination of her parental rights was appropriate on the ground of failure to rectify.
The court can terminate parental rights for failure to rectify under Section 211.447.5(3) when (1) the child has been under the circuit court's jurisdiction for a period of one year; and (2) either (a) conditions that led to the assumption of jurisdiction still persist or (b) conditions of a potentially harmful nature continue to exist; and (3) either (a) there is little likelihood that those conditions will be remedied at an early date so the child can be returned to the parent in the near future, or (b) continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In re B.J.K. , 197 S.W.3d 237, 243 (Mo. App. 2006).
Here, the court determined that both conditions that led to the assumption of jurisdiction still persist and that conditions *337 of a potentially harmful nature continue to exist. The court first found that, despite the extensive services that were offered to Mother, she failed to remedy concerns pertaining to her ability to provide for Son's safety. Specifically, the court noted that Mother's lack of anger management and impulse control have lasted throughout the entirety of the case. To support this finding, the court cited Mother's history of domestic violence against Grandmother, which began before the court took jurisdiction of Son in 2013, continued through August 27, 2015, when Mother was arrested and charged with assault and domestic violence, and remained a concern for Grandmother even past Mother's successful completion of mental health court in May 2016. Indeed, as late as November 2016, two months before trial began, Grandmother was still barricading herself in her bedroom due to her fear of Mother. The court also cited Mother's yelling and threatening her parent aide during supervised visits in 2014 and 2015, resulting in the police having to be called to ensure Son's and the parent aide's safety. Lastly, the court noted that Mother continued to lash out angrily at her parent aide in the summer of 2016, sending the parent aide expletive-filled texts when she disagreed with the parent aide's decisions regarding rescheduling missed visitations.
The second potentially harmful condition that the court found was Mother's lack of meaningful progress in the services that had been provided to her. The court noted that Mother had been provided therapists, parent aides, psychological evaluations, neuropsychological evaluations, case management services, assistance with independent living, vocational rehabilitation, work programs, job assistance, and parent education. The court found that, despite over three years of services, Mother had not meaningfully progressed in these services to allow for reunification at any point in the last three and one-half years or at any point in the near future. Indeed, the record showed that Mother had not progressed to the point where she could have unsupervised visitation with Son, and according to Mother's current parent aide, Mother had not developed the parenting skills or the mental capacity to safely and adequately care for Son's mental, physical, and medical needs right now or in the reasonably foreseeable future.
A third potentially harmful condition that the court found was Mother's making poor and unsafe decisions throughout the pendency of the case. In particular, the court cited Mother's relationships with men she met over the internet, including her volatile long-distance relationship with C.B. Despite Mother's admitting that C.B. was verbally abusive and the relationship was unhealthy, Mother continued to communicate with him, falsely told others she was married to him, and hid with Son under a table during a supervised visit so that she could Skype with C.B. in violation of the court's order that C.B. have no contact with Son. Other examples of Mother's poor judgment that the court cited were her numerous assaults on Grandmother, her assault on a police officer, and her screaming in a crowded mall that the parent aide was stealing Son.
A fourth potentially harmful condition the court found was Mother's failure to adequately appreciate and understand the concerns that brought Son under the court's jurisdiction and prevented him from returning to her care, which the court believed pose a future safety risk because her behavior and actions are likely to continue. Specifically, the court noted that Mother testified that she believes this was a case of medical kidnapping done by the Division for financial gain and that the reason Son had not been returned to her care was because the case worker wanted *338 Son to be adopted. Mother testified that, if Son were released to her custody, she would not continue with any individual or family therapy, or any other services, unless they were court ordered. She said that she would need help only with babysitting and would take care of Son's needs, which are extensive, by herself. Yet, Mother admitted that she had never inquired as to potential daycare services for Son and had never inquired as to whether Son could obtain the special services he is currently receiving if he moved into her school district. She was unable to articulate any specific plan for ensuring that Son continued to receive the services he needs.
A fifth potentially harmful condition that the court found was Mother's failure to make life choices to assist her in becoming more independent so that she does not remain dependent on Grandmother or others. In particular, the court cited Mother's failure to obtain employment during the pendency of the case, despite being capable of employment and being offered vocational rehabilitation and assistance in obtaining employment. Additionally, the court noted Mother's letting Medicaid lapse and delaying reapplying for it, her failure to follow up with housing opportunities, and her failure to obtain a driver's license or a car. The court found that Mother was totally dependent upon Grandmother and paid nothing toward rent, utilities, or household expenses.
In arguing that the evidence of these conditions was insufficient to support termination on the ground of failure to rectify, Mother asserts that the majority of the evidence was from 2015 and earlier and that she made significant progress in the 12 to 18 months prior to trial. While there was evidence that Mother finally began to consistently participate in therapy to manage her anger in 2016, the court found that, to the extent any progress was made, it was made after her assault and domestic violence charges, when Mother's options were to either go to criminal court or participate in the mental health court program. We also note that most of Mother's progress in therapy and her participation in services occurred after the termination petition was filed on February 5, 2016. "Evidence of short-term improvements in a parent's circumstances occurring after the filing of the termination petition is not necessarily compelling, as the parent's conduct subsequent to a petition for termination is not the sole consideration in the trial court's determination." In re J.J.B. , 314 S.W.3d 425, 432 (Mo. App. 2010) (citation omitted). Moreover, there was evidence that, after Mother completed mental health court, she continued to have anger management issues toward her parent aide and Grandmother. In fact, as of the date of trial, Mother's therapist estimated her progress at managing her anger and effectively using her coping skills at only a three or four on a scale of one to ten. Clear and convincing evidence supported the court's determination that the conditions that led to the assumption of jurisdiction still persist, conditions of a potentially harmful nature continue to exist, and there is little likelihood that those conditions will be remedied at an early date so that Son can be returned to Mother in the near future.
In deciding whether to terminate parental rights under Section 211.447.5(3), the court must also consider and make findings on four factors listed in subparagraphs (a) through (d) of the section. These four factors are:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
*339 (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
§ 211.447.5(3)(a)-(d). In this case, only factors (a), (b), and (c) are applicable, as the court found that there was no evidence offered concerning factor (d).
With regard to factor (a), the court determined that Mother entered into a written service agreement in June 2014 but was unsuccessful in achieving any of the goals contained in the agreement. Under the agreement, Mother's goals were to learn how to appropriately care for Son, learn how to manage her emotions so they do not put family members in danger, and be able to care for herself and her family. Mother argues that the court's determination that she was unsuccessful in achieving any of these goals was not supported by the evidence. We disagree.
The record showed that, for the better part of the three and one-half years that the court had jurisdiction of Son, Mother was defiant and refused to take direction from her parent aides regarding how to properly care for Son during her supervised visits. While Mother eventually began to work with her last parent aide, this parent aide also testified that, as of the date of trial, Mother had not developed the parenting skills or the mental capacity to safely and adequately care for Son's mental, physical, and medical needs right now or in the reasonably foreseeable future.
Mother also failed to meet her second goal of learning how to manage her emotions enough to keep Son safe. The evidence showed that Mother's mental conditions are permanent. For the majority of the three and one-half years that the court had jurisdiction of Son, Mother did not consistently attend individual therapy and was discharged from one program for non-compliance and non-attendance. As previously noted, while there was evidence that Mother made progress in managing her anger and learning coping skills in the year before trial, her current therapist rated Mother's progress on her treatment goals at a three or four out of ten.
The evidence concerning Mother's last goal of being able to care for herself and her family was that Mother had begun to help Grandmother with doing laundry, cooking, and paying bills. Mother took no steps, however, toward obtaining employment.
As for factor (b), the court determined that the Division had made extensive, yet unsuccessful, efforts to provide Mother services that would help her adjust her circumstances or conduct to provide a proper home for Son. Although Mother contends that the services offered were not sufficient to address her mental health conditions and that she was not given sufficient time to avail herself of the services, the record showed that, over the course of three and one-half years, Mother was offered psychological and neuropsychological evaluations; various therapeutic services, including individual therapy; parent aide services; parent education; vocational rehabilitation;
*340 employment assistance; independent living assistance; and housing assistance. The record indicated that Mother was uncooperative for the majority of time she was offered these services and that, to the extent that Mother made any progress, it was made only after she opted to participate in the mental health court program to avoid criminal prosecution.
Lastly, with regard to factor (c), the court determined that Mother suffers from mental health conditions that prevent her from consistently providing the necessary care, custody, and control of Son and that cannot be treated so as to enable her to consistently provide such care, custody, and control. In considering a parent's mental condition, the court looks to the parent's "current mental health status and how that status impacts her present and future ability to adequately parent" the child. In re C.W. , 211 S.W.3d 93, 100 (Mo. banc 2007), abrogated on other grounds by In re B.H. , 348 S.W.3d 770 (Mo. banc 2011).
The court found that three separate mental health professionals diagnosed Mother with several permanent mental conditions. Khan, the psychiatrist who evaluated Mother, diagnosed her with PTSD, major depressive disorder, mood disorder, learning disorder, impulse control disorder, and mild mental retardation. There was no evidence that Mother no longer suffered from these conditions or that they would be reversed. Khan placed Mother's intellectual functioning at a fifth or sixth grade level and noted that Mother's decisional capacity is very poor, and she gets easily frustrated. Khan also expressed concern for the choices that an individual with these diagnoses would make for themselves and opined that there is a greater likelihood that a child dependent upon that individual would not be in a safe environment.
While there was evidence that Mother had made some progress in managing some of her conditions, the evidence showed that Mother had not made sufficient progress to enable Son's safe return to her now or in the reasonably foreseeable future. Mother continued to have angry outbursts toward her parent aide a few months before trial, and she continued to cause Grandmother to fear for her safety as recently as two months before trial. Mother remained unable to appreciate the severity of her conditions. This was evidenced by her reticence to accepting treatment and complying with medication recommendations until she was required to do so to avoid criminal prosecution and her testimony that she was participating in therapeutic services only because the court ordered it and would stop such services when the court was no longer involved. Mother also remained unable to appreciate the concerns that caused the court to take jurisdiction over Son and the extent of Son's medical and developmental needs. This was shown in her unwillingness to accept redirection from parent aides, her continued insistence at trial that Son was taken from her custody not because of his failure to thrive in her care but because this was a case of "medical kidnapping," and her testimony that, aside from help with babysitting, she could care for Son by herself. This evidence was sufficient to support the court's determination that Mother's mental conditions render her unable to knowingly provide the necessary care, custody, and control of Son now or in the foreseeable future.
Mother contends that this case is "strikingly similar" to In re L.J.D. , 352 S.W.3d 658 (Mo. App. 2011), a case in which the court on appeal found the evidence was insufficient to support the circuit court's determination that the mother had a mental condition that rendered her unable to *341 provide the child the necessary care, custody, and control. In particular, the court found the record lacked (1) substantial evidence establishing the requisite causal connection between the mother's disability and any harm to the child; (2) substantial evidence that the mother's disability rendered her actually unable to care for the child; and (3) substantial evidence that the mother was unable to properly administer her own or her son's medications. Id. at 666. Unlike in L.J.D. , however, the record in this case contained substantial evidence that Mother's mental conditions, particularly her lack of anger management and impulse control, her inability to make good decisions, and her inability to appreciate both the severity of her conditions and the extent of Son's needs, pose a serious safety risk to Son and render her unable to actually care for Son now or in the reasonably foreseeable future.
When the record is viewed in the light most favorable to the judgment, there was substantial evidence to support the circuit court's decision to terminate Mother's parental rights for failure to rectify under Section 211.447.5(3). Mother's Points V and VI are denied. Because we find that termination on this ground was appropriate, we need not address Mother's Points III, IV, and VII, which challenge the court's decision to terminate on grounds of neglect and parental unfitness.
Best Interest Factors
In Point VIII, Mother contends the evidence was insufficient to support the court's finding that the termination was in Son's best interest. We review the determination that termination was in Son's best interest for an abuse of discretion. In Interest of A.C.G. , 499 S.W.3d 340, 349 (Mo. App. 2016). We defer to the circuit court's factual findings and credibility determinations and do not reweigh the evidence. Id. Section 211.447.7 directs the circuit court to evaluate seven factors when considering whether termination of parental rights is in the child's best interest:
(1) The emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
(5) The parent's disinterest in or lack of commitment to the child;
(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
"There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." In re C.A.M. , 282 S.W.3d 398, 409 (Mo. App. 2009). Instead, these factors "are merely an aid to the 'best interests' determination." In re G.G.B. , 394 S.W.3d 457, 472 (Mo. App. 2013). "The 'best interests' determination *342 is a subjective assessment based on the totality of the circumstances." In re S.Y.B.G., 443 S.W.3d 56, 66 (Mo. App. 2014).
In this case, the court found that only the first five factors were applicable. With regard to the first factor, the court found that Son was bonded to his foster parents, with whom he had lived since he was two months old, and had minimal emotional ties to Mother. Mother contends that this finding was not supported by the evidence because her case worker testified that Son recognizes Mother and has a loving relationship with her, and her parent aide testified that Mother and Son were excited to see each other during visits. In response, the Division argues that the court's finding was supported by the fact that Son's foster family "is the main family he knows." We agree with Mother that evidence that Son was bonded to his foster parents did not diminish Son's emotional ties to Mother and, therefore, did not support the court's finding that Son has minimal emotional ties to Mother.
As for factor (2), the evidence supported the court's finding that Mother had supervised visitation with Son since he was removed from her care, but this visitation was stopped or suspended on several occasions out of safety concerns for Son due to Mother's inability to control her anger. The evidence also supported the court's finding that, aside from a brief period when Mother was granted short, unsupervised, "sandwich" visits, which were ended due to Mother's behavior, Mother never had an entire unsupervised visit, overnight stay, or trial home placement, because she never made sufficient progress to do so in the three and one-half years that the court had jurisdiction over Son.
Regarding factor (3), the evidence supported the court's finding that Mother failed to provide adequate support for Son while he was the Division's custody. At the time of trial, Mother was $1000 in child support arrears (based on a child support obligation of $50 monthly), had repeatedly refused the Division's assistance to obtain employment, and contended that she should not have to pay child support while Son was in the State's custody.
With regard to factor (4), the evidence supported the court's finding that additional services are not likely to bring about a lasting parental adjustment enabling Son's return to Mother within an ascertainable period of time. As discussed supra , Mother was offered numerous services over the past three and one-half years, but her willingness to participate in those services was inconsistent. Mother never adequately addressed the issues and safety concerns that prevented her from having unsupervised visitation with Son, and she indicated that she was participating in services only because the court ordered them and would stop them when the court was no longer involved.
As for factor (5), the evidence supported the court's finding that, while Mother clearly loves Son and wants to be with him, she has exhibited a disinterest or lack of commitment to the child by either refusing to participate or not fully participating in the services necessary to permit reunification until after she was required to do so to avoid criminal prosecution on her assault and domestic violence charges.
While the evidence did not support the court's finding that Son has minimal emotional ties to Mother, there was ample evidence to support the court's findings on the remaining best interest factors. Therefore, we cannot say that the court abused its discretion in finding that termination of Mother's parental rights was in Son's best interest. Point VIII is denied.
*343 Admission of Evidence of Sexual Assault
Lastly, in Point IX, Mother asserts that the court erred in admitting and relying upon evidence of a sexual assault perpetrated against her because the evidence was irrelevant and immaterial. At trial and over Mother's objection, the court allowed the Division to present evidence that Mother was sexually assaulted by a cab driver in June 2016 after she allowed him into her home. In its judgment, the court cited the incident as an example of Mother's making poor and unsafe decisions that could negatively impact Son, which the court determined is a condition of a potentially harmful nature that continues to exist.
Mother argues that this evidence was neither logically nor legally relevant, as it had "absolutely no connection to [her] ability to parent" and "unfairly prejudiced [her] as the victim of the sexual assault." We need not decide whether the court abused its discretion in admitting and considering this incident, however. The other evidence supporting the termination of Mother's parental rights for failure to rectify was overwhelming. Thus, any error in the admission of evidence of this incident did not result in outcome-determinative prejudice and, therefore, reversal would not be required. See In re D.L.W. , 413 S.W.3d 2, 9-10 (Mo. App. 2012). Point IX is denied.
CONCLUSION
The Division's motion to transfer this case to the Supreme Court is denied. The judgment is affirmed.
All Concur.

All statutory references are to the Revised Statutes of Missouri 2016.